[No. S147954. May 12, 2008.]

JESSE JAMES HOLLYWOOD, Petitioner, v.
THE SUPERIOR COURT OF SANTA BARBARA COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

## COUNSEL

Law Offices of James E. Blatt, James E. Blatt, Michael G. Raab; and Armand Arabian for Petitioner.

No appearance for Respondent.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Donald E. de Nicola, Deputy State Solicitor General, Robert R. Anderson, Mary Jo Graves and Dane R. Gillette, Chief Assistant Attorneys General, Pamela C. Hamanaka, Assistant Attorney General, Steven D. Matthews, Robert M. Snider, Kristofer Jorstad and David F. Glassman, Deputy Attorneys General; Thomas W. Sneddon, Jr., and Christie Stanley, District Attorneys, and Gerald McC. Franklin, Deputy District Attorney, for Real Party in Interest.

Michael A. Ramos, District Attorney (San Bernardino) and Grover D. Merritt, Lead Deputy District Attorney, for California District Attorneys Association as Amicus Curiae on behalf of Real Party in Interest.

## OPINION

**WERDEGAR, J.**—Does a prosecutor's consulting with the makers of a major motion picture that is based on a criminal defendant's story create a conflict sufficient to require recusal of the prosecutor when the defendant is finally brought to trial? Here, the lead prosecutor, bent on tracking down the fugitive defendant in this capital case, gave his case files to a screenwriter/director to make a movie based on the defendant's alleged life and crimes and consulted with the filmmakers during its subsequent production. The defendant, Jesse James Hollywood, was ultimately captured in Brazil and extradited to the United States. He moved to recuse the prosecutor, arguing that the prosecutor's involvement with Hollywood, the film industry, precluded his prosecution of Hollywood, the capital defendant. The trial court found no conflict warranting recusal, but the Court of Appeal independently reviewed the record and granted Hollywood's petition for a writ of mandate, with one justice explaining the prosecutor had permitted " 'show business' to cast an unseemly shadow over this case."

In this case and its companion, *Haraguchi v. Superior Court* (2008) 43 Cal.4th 706 [76 Cal.Rptr.3d 250, 182 P.3d 579], we consider the extent to which prosecutorial involvement in cinematic and literary endeavors may give rise to conflicts requiring recusal, as well as the standard for reviewing whether the trial court erred in finding the existence or absence of a disqualifying conflict. We reject the Court of Appeal's conclusion that capital cases are sufficiently different from ordinary criminal cases that application of a higher standard of appellate scrutiny to recusal motions is required. Furthermore, as in *Haraguchi*, we reverse the Court of Appeal based on its failure to grant appropriate deference to the trial court's ruling and based on the presence in the record of evidence sufficient to support the trial court's conclusion that no disqualifying conflict existed and no unlikelihood of a fair trial had been proven.

### FACTUAL AND PROCEDURAL BACKGROUND

This case arises from the kidnapping and murder of 15-year-old Nicholas "Nick" Markowitz. As did the Court of Appeal, we draw our description of the crime from the People's opposition to Hollywood's petition for a writ of mandate. Four people have been convicted or pleaded guilty in connection with the Nick Markowitz murder, but Hollywood, of course, has not; thus, our recitation of his involvement is based on pretrial allegations.

According to the People, Hollywood was a drug dealer in the San Fernando Valley and Nick Markowitz's older half brother Ben was one of his distributors. Ben and Hollywood had a falling out over money Ben owed Hollywood. Ben broke out the windows of Hollywood's residence. On their way to retaliate, Hollywood, Jesse Rugge, and William Skidmore spotted Nick on the street and kidnapped him, perhaps with the idea of extorting repayment from Ben.

Nick was held hostage for three days. At some point he was released from any physical restraints but did not flee. Hollywood eventually gave another confederate, Ryan Hoyt, a gun and orders to kill Nick. Hoyt and Graham Pressley dug a shallow grave in the foothills outside Santa Barbara. Hoyt and others then drove Nick into the foothills and marched him to the gravesite. Hoyt hit him over the head with a shovel, then shot him. The confederates buried Nick and returned to Santa Barbara.

Within days, Nick Markowitz's body had been found, and Hoyt, Rugge, Pressley, and Skidmore had been captured. Hollywood, however, became a fugitive.

In October 2000, the District Attorney of Santa Barbara County filed a two-count indictment against Hollywood, Hoyt, Skidmore, Rugge, and

Pressley. Count 1 charged them with the murder of Nick Markowitz. (Pen. Code, § 187, subd. (a).)[1] It alleged as a special circumstance that defendants had committed the murder during the commission of a kidnapping in violation of section 207. (§ 190.2, subd. (a)(17)(B).) Count 2 charged defendants with kidnapping Nick Markowitz for the purpose of ransom or to commit extortion in violation of section 209, subdivision (a). Santa Barbara County Deputy District Attorney Ronald Zonen prosecuted Hoyt, Skidmore, Rugge, and Pressley and obtained convictions or guilty pleas for each.[2]

In the spring of 2003, Zonen was contacted by Nick Cassavetes, a film director and screenwriter who wanted to make a film, Alpha Dog, based on the Markowitz murder. Cassavetes asked Zonen "if he could provide any assistance or materials to help create a screenplay, including trial transcripts, witness contacts, etc." According to Zonen, he decided to turn over materials to Cassavetes and act as a consultant in Cassavetes's preparation of Alpha Dog "in the hope that the publicity would result in Hollywood's apprehension."

In March 2005, Hollywood was captured in Brazil and extradited to the United States to be tried for kidnapping and special circumstance murder. Hollywood's defense learned of Zonen's cooperation with the Alpha Dog filmmakers and filed a motion to recuse both Zonen and the entire Santa Barbara County District Attorney's Office. Hollywood alleged Zonen's cooperation in the making of Alpha Dog created a conflict because (1) Zonen had acted illegally and unethically by disclosing confidential documents, including criminal records, police reports, and probation reports, to the filmmakers; and (2) by cooperating in the making of a movie that presented a distorted view of Hollywood, Zonen sought to burnish his own legacy (were he to later obtain Hollywood's conviction) and impaired Hollywood's opportunity to receive a fair trial.

The trial court held two lengthy hearings to examine these contentions. At the first, it announced its tentative conclusions that (1) Zonen had no financial conflict, as he had received no consideration for his cooperation; (2) Zonen's disclosure of confidential information, whether or not a legal or ethical breach, did not rise to the level of a conflict warranting recusal; and (3) Zonen's asserted interest in burnishing his legacy by raising the profile of the case did not amount to an impermissible conflict. Moreover, "even assuming one were to take the view there was a conflict," the trial court could

---

[1] All further unlabeled statutory references are to the Penal Code.

[2] Zonen elected to seek the death penalty only against Hollywood, the alleged ringleader, and Hoyt, the alleged actual killer. Hoyt was convicted of first degree murder and sentenced to death. Rugge, Skidmore, and Pressley were convicted of or pleaded guilty to varying lesser crimes.

"conceive of no likelihood that it would prevent [Hollywood] from receiving a fair trial." However, the trial court continued the matter for an evidentiary hearing into whether Zonen might have acted improperly by ordering Michael Mehas, an associate producer who had interviewed numerous percipient witnesses while researching the film, not to cooperate with the defense.

At the evidentiary hearing, the trial court allowed the defense to examine Mehas extensively and also posed its own questions to determine what, if anything, Zonen might have done to interfere with the defense. At the close of the hearing, it concluded Mehas had elected to cease cooperation with the defense of his own accord, Zonen had not acted improperly, and the defense had failed to establish any conflict warranting recusal.

Hollywood filed a petition for a writ of mandate with the Court of Appeal, which summarily denied relief. We granted review and transferred the case back to the Court of Appeal with directions to issue an order to show cause. After further briefing and argument, the Court of Appeal issued an opinion the same day as the companion case *Haraguchi v. Superior Court*. Emphasizing the unusual and distinctive facts of these cases, the Court of Appeal exercised its independent judgment and concluded: "In this first impression death penalty case we should not give our imprimatur to Zonen's conduct or embolden other prosecutors to assist the media in the public vilification of a defendant in a case which is yet to be tried. Perhaps without intending to do so, Zonen has potentially infected the jury pool with his views on the strength of the People's case. Prosecutors should try their cases in courtrooms, not in the newspapers, television, or in the movies. . . . To say that Zonen went too far in his attempt to apprehend [Hollywood] is an understatement." On that basis, the Court of Appeal held "justice would not be served if Zonen remains as the trial prosecutor," but it denied recusal of the rest of the district attorney's office.

We granted review in this case and in *Haraguchi* to consider both the standard of review and its application to prosecutorial recusal motions based on literary or cinematic endeavors.

DISCUSSION

### I. *Standards for a Motion to Recuse*

■ As we explained in *Haraguchi v. Superior Court, supra,* 43 Cal.4th at page 711: "Section 1424 sets out the standard governing motions to recuse a prosecutor: such a motion 'may not be granted unless the evidence shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial.' (*Id.,* subd. (a)(1).) The statute 'articulates a two-part test: "(i) is there a conflict of interest?; and (ii) is the conflict

so severe as to disqualify the district attorney from acting?" ' (*Hambarian v. Superior Court* (2002) 27 Cal.4th 826, 833 [118 Cal.Rptr.2d 725, 44 P.3d 102], quoting *People v. Eubanks* [(1996)] 14 Cal.4th [580,] 594 [59 Cal.Rptr.2d 200, 927 P.2d 310].)" In *Haraguchi*, we also reaffirmed the general rule that motions to recuse a prosecutor are reviewed for an abuse of discretion. (*Haraguchi v. Superior Court*, at pp. 711–713.)

The Court of Appeal in this case gave no deference to the trial court's findings of fact or its application of the law to those facts. Having rejected in *Haraguchi* two arguments the Court of Appeal offered there in support of independent review—that cases of first impression warrant heightened scrutiny, and appellate courts have an independent interest in policing error pretrial—we consider here an additional argument for more stringent review offered by the Court of Appeal: potential capital cases like this one should be treated differently.

The Court of Appeal noted the United States Supreme Court's oft-quoted aphorism, "[D]eath is different." (*Gregg v. Georgia* (1976) 428 U.S. 153, 188 [49 L.Ed.2d 859, 96 S.Ct. 2909] (lead opn. of Stewart, J.); accord, e.g., *Ring v. Arizona* (2002) 536 U.S. 584, 606 [153 L.Ed.2d 556, 122 S.Ct. 2428]; *Harmelin v. Michigan* (1991) 501 U.S. 957, 994 [115 L.Ed.2d 836, 111 S.Ct. 2680]; *Ford v. Wainwright* (1986) 477 U.S. 399, 411 [91 L.Ed.2d 335, 106 S.Ct. 2595]; *Gardner v. Florida* (1977) 430 U.S. 349, 357 [51 L.Ed.2d 393, 97 S.Ct. 1197] (plur. opn. of Stevens, J.).) We do not disagree. But the conclusion the Court of Appeal drew—that this difference compels a different standard of review for such cases—is incorrect.

■ We have consistently reviewed trial court rulings on recusal motions under the abuse of discretion standard even in automatic appeals from death sentences, albeit without expressly considering whether the punishment imposed might on some · theory warrant more stringent review. (See, e.g., *People v. Griffin* (2004) 33 Cal.4th 536, 568–570 [15 Cal.Rptr.3d 743, 93 P.3d 344]; *People v. Millwee* (1998) 18 Cal.4th 96, 122–125 [74 Cal.Rptr.2d 418, 954 P.2d 990]; *People v. Zapien* (1993) 4 Cal.4th 929, 968 [17 Cal.Rptr.2d 122, 846 P.2d 704]; *People v. Breaux* (1991) 1 Cal.4th 281, 293–295 [3 Cal.Rptr.2d 81, 821 P.2d 585]; *People v. Hamilton* (1989) 48 Cal.3d 1142, 1154–1156 [259 Cal.Rptr. 701, 774 P.2d 730].) Today, we expressly hold the abuse of discretion standard is the proper one for prosecutorial recusal motions, even in capital cases.

Our criminal justice system strives in each case to afford defendants procedurally fair trials while arriving at empirically correct outcomes, convicting the guilty and absolving the innocent. (See *People v. Superior Court (Greer)* (1977) 19 Cal.3d 255, 266 [137 Cal.Rptr. 476, 561 P.2d 1164] [the

prosecutor is " 'the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer' "], quoting *Berger v. United States* (1935) 295 U.S. 78, 88 [79 L.Ed. 1314, 55 S.Ct. 629].) The punishment at issue in capital cases makes it all the more important to ensure fairness and arrive at accurate outcomes. But nothing in the Court of Appeal's proposed de novo standard of review promotes those twin goals. For recusal motions in noncapital cases, we give trial courts primacy in factfinding and in assessing whether and how great a conflict exists not because the stakes are less and errors more conscionable, but because our trial courts are genuinely in the best position "to assess witness credibility, make findings of fact, and evaluate the consequences of a potential conflict in light of the entirety of a case, a case they inevitably will be more familiar with than the appellate courts that may subsequently encounter the case in the context of a few briefs, a few minutes of oral argument, and a cold and often limited record." (*Haraguchi v. Superior Court, supra*, 43 Cal.4th at p. 713.) Nothing about these circumstances suggests to us that de novo review of recusal motions in capital cases would increase either the accuracy or the fairness of these proceedings. The same point answers the Court of Appeal's concern about reducing the likelihood of belated reversal later on in the lengthy capital appeal process; we have no basis on which to conclude independent review would reduce the risk of error. We therefore conclude that in capital cases, as in all others, the trial courts' rulings should be reviewed only for an abuse of discretion.[3]

## II. *Application*

We further consider whether the trial court erred in finding no conflict or whether the Court of Appeal erred in reversing based on its independent view that in fact the lead prosecutor should have been recused. Here, we have the reverse of the *Haraguchi* circumstances: a fictional account that *was* intimately tied to and directly based on the prosecution at issue, but in which the challenged prosecutor had no financial interest.

In the trial court and on appeal, Hollywood has identified as a source of conflict (1) Zonen's actions in disclosing confidential information, (2) his cooperation in the distribution of an allegedly inflammatory portrayal of

---

[3] As an alternate ground for independent review, Hollywood contends the trial court in this case committed a litany of errors in evaluating the evidence and applying the law. The conduct of a trial court in an individual case is no answer to the institutional concerns that have led us to adopt abuse of discretion as the appropriate standard of review. Moreover, abuse of discretion review is not equivalent to no review; in cases where a trial court's errors truly are as egregious as Hollywood claims them to be here, reversal would be mandated even under deferential review.

Hollywood, (3) incidental future benefits to Zonen arising from the distribution of Alpha Dog, and (4) the totality of the circumstances. We consider each in turn.

## A. *Disclosure of Prosecutorial Documents*

Zonen concedes that in the course of assisting the Alpha Dog filmmakers, he gave them materials from his *Hollywood* case file and from the case files of the four completed prosecutions. Filmmaker Cassavetes described the materials turned over as "voluminous." The trial court assumed for purposes of its ruling that everything in the case files for the completed prosecutions was made available.

Crediting Zonen's statements, the trial court concluded that if Zonen disclosed any confidential documents, such disclosures were inadvertent and at most negligent, not intentional. The trial court was entitled to credit Zonen, and his statements constitute substantial evidence. The trial court declined to make findings on the further question whether Zonen's disclosure of documents in fact involved any Penal Code violations.[4]

Violations of the law regarding dissemination of confidential records are sanctionable and may result in criminal prosecution and punishment. (See, e.g., §§ 11105, 11140–11144 [regulating dissemination of criminal records and making unlawful dissemination a misdemeanor], 1203.05 [regulating dissemination of probation reports].) Recusal is also an available sanction. Hollywood argues that if zeal within legal limits does not amount to a recusable conflict, as we have said (*Hambarian v. Superior Court, supra,* 27 Cal.4th at p. 843), then zeal that exceeds legal limits perforce must amount to a conflict *requiring* recusal.

We disagree. While recusal may be available in cases where there has been an illegal disclosure of confidential documents, it is not mandatory. Rather, recusal is appropriate if and only if, as we have framed the test, the disclosure gives rise to a conflict " ' "so grave as to render it unlikely that defendant will receive fair treatment." ' " (*People v. Vasquez* (2006) 39 Cal.4th 47, 56 [45 Cal.Rptr.3d 372, 137 P.3d 199].) Thus, it is for the trial court in

---

[4] On a related point, after listening to extensive testimony from Mehas, the trial court made an express finding that Zonen had not attempted to dissuade him from cooperating with the defense, concluding instead that Mehas had unilaterally elected to cease cooperation because he felt bad about putting Zonen in an awkward situation. In his briefing to this court, Hollywood persistently asserts that Zonen acted improperly by dissuading a witness, without acknowledging the trial court's contrary factual finding or offering any argument as to why that finding is unsupported by substantial evidence. In the absence of any such argument, we accept the trial court's finding.

the first instance to consider whether the fact of disclosure and its collateral effects (such as, for instance, a fear of being personally prosecuted) are likely to affect the challenged prosecutor's ability to exercise discretionary functions in an evenhanded fashion and render a fair trial unlikely.

The trial court focused on that precise question, repeatedly asking Hollywood's counsel to explain how, if indeed Zonen had committed legal breaches, they might create a conflict for him and deprive Hollywood of a fair trial.[5] In the end, the trial court was not persuaded that the disclosures did create any conflict. Reviewing for an abuse of discretion, we agree. While in the abstract it is conceivable a fear of criminal sanctions might alter how Zonen handled this case, the trial court found Zonen credible and concluded the possibility that confidential documents might have been disclosed inadvertently would not prevent Zonen from acting fairly toward Hollywood. That conclusion does not appear arbitrary or capricious and is supported by substantial evidence.

In adopting the contrary view, the Court of Appeal neither explained how the disclosure of documents created a conflict nor how such a conflict might deprive Hollywood of a fair trial. Instead, it appears to have reasoned that Zonen committed misconduct and for that reason alone should have been removed as prosecutor. Putting aside for the moment the absence of any trial court finding that Zonen committed misconduct, we emphasize that recusal motions are not disciplinary proceedings against the prosecutor. The ultimate focus of the section 1424 inquiry is on protection of the defendant's rights, not whether recusal may be just or unjust for the prosecutor. Thus, in some cases a prosecutor may have committed misconduct but not be subject to recusal because the misconduct does not impair the defendant's right to a fair proceeding; in other cases, a prosecutor may commit no misconduct but nevertheless be subject to recusal because a conflict, through no fault of the prosecutor's, jeopardizes the defendant's rights. Here, the trial court could conclude that even if there was misconduct, it did not deprive Hollywood of his right to a fair trial. Under the circumstances, that ruling was not an abuse of discretion, and we defer to it on appeal.

---

[5] At the first hearing, the trial court asked: "The question is, did any of the documents being turned over to the filmmakers prevent your client from having a fair trial? And if so, how?" At the second hearing, it inquired again: "But whether inadvertent or negligent, what I'm interested in is why the turning over of that information, one, is a conflict, and, two, prevents your client from having a fair trial. [¶] I mean, we haven't even addressed the second point, which is how the turning over of . . . information in police reports for the purposes of attempting to create an accurate portrayal of people involved in a crime[,] how that would prevent your client from having a fair trial."

### B. *Distribution of a Motion Picture Reflecting the Prosecution's View of This Case*

Next, Hollywood contends it was misconduct for Zonen to cooperate in the dissemination of a major motion picture that would convey his (distorted, according to Hollywood) view of Hollywood.[6] The Court of Appeal likewise criticized Zonen for trying his case in the movies.

While the prosecution ethically may discuss information necessary to aid in the apprehension of fugitives (Rules Prof. Conduct, rule 5-120(B)(7)(b)), its freedom to do so is not without limits. Certainly, a case might arise in which a trial court could order recusal based on the prosecution's attempt to manipulate the prospective jury pool by disseminating inflammatory portrayals of the defendant. (See *id.*, rule 5-120(A) [attorney may not make extrajudicial statements he or she "reasonably should know . . . will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter"].)

However, the trial court found this was not that case, concluding that (1) Zonen's cooperation came before Hollywood had been captured and was solely motivated by his desire to have Hollywood captured so he could be tried in a court of law, and (2) Zonen sought throughout to have Hollywood portrayed in as *accurate* a fashion as possible. Each of these conclusions is supported by substantial evidence. Zonen declared under oath that Hollywood's capture was his sole motivation, and indeed Hollywood and the Court of Appeal both agreed that it was at least his principal motivation. Zonen declared that he sought to have Hollywood portrayed accurately;

---

[6] Since the trial court decided the motion to recuse, and over Hollywood's efforts to have distribution enjoined, Alpha Dog has been released. (Alpha Dog (Universal Studios 2007); see *Hollywood v. Universal Studios, Inc.* (C.D.Cal., Dec. 12, 2006, No. CV06-6849-RGK (RCx)) order, pp. 2–4 [denying injunction on First Amendment grounds].) On our own motion, we have taken judicial notice of the fact of its release.

The precise content of the film was not before the trial court, nor is it particularly relevant to the recusal motion. The trial court assumed for purposes of its decision that while Zonen cooperated with the intent that the filmmakers make and distribute an accurate portrayal of Hollywood, his view of the facts and of Hollywood might legitimately vary widely from the defense's. The trial court thus did not take issue with defense counsel's representation that some moviegoers thought Hollywood was portrayed as a "monster." Similarly, we do not consider whether the portrayal of Hollywood as "Johnny Truelove" in Alpha Dog is accurate; for purposes of the recusal motion, we may assume, as the trial court did, that the film hews closely to the prosecution's view and is considerably at odds with the defense's view. Accordingly, and because the film was not part of the trial court record at the time of the trial court's decision, we have denied Hollywood's motion to augment the record with a copy of the film itself. (See *People v. Tuilaepa* (1992) 4 Cal.4th 569, 585 [15 Cal.Rptr.2d 382, 842 P.2d 1142] [augmentation and like procedures "are intended to ensure that the record transmitted to the reviewing court preserves and conforms to the proceedings actually undertaken in the trial court"]; Cal. Rules of Court, rule 8.155.)

likewise, Hollywood himself submitted a videotape in which Mehas, leaving a 2003 meeting with Zonen, reported Zonen had told the filmmakers he wanted them to make the movie as accurate as possible. The trial court expressly credited these uncontradicted statements.

Of course, as the trial court recognized, Zonen's views on what constitutes an "accurate" portrayal of Hollywood might vary widely from those of defense counsel. In a criminal case where the defendant is charged with capital crimes, this is wholly unsurprising. Equally important to remember is that at the time Zonen made his remarks, he *had* no case. Hollywood had successfully vanished into thin air; for years he had eluded extensive attempts by law enforcement to locate him, and the trail had gone cold. The trial court concluded Zonen was only conveying his honest assessments of a fugitive defendant to Cassavetes and others in the hope their subsequent portrayal would lead to the fugitive's capture, and his doing so did not create a conflict. On this record, it was not an abuse of discretion to so conclude.

■ We note as well that if in fact the jury pool in this case has been affected in any way by the release of Alpha Dog, this is a matter that can be handled during voir dire through the close questioning of individual prospective jurors. (See *Haraguchi v. Superior Court, supra,* 43 Cal.4th at pp. 718–719.) This case is not the first in which pretrial publicity may create an issue with respect to ensuring a fair trial for the defendant, nor is it the first in which one side or the other may be inordinately responsible for that publicity.[7] In many or most such cases, measures short of recusal will suffice to address any such fairness issues and ensure the defendant's rights are protected. Motions to recuse are directed to the trial court's discretion in part because the trial court is in the best position to assess in the first instance whether it can handle pretrial publicity issues with such lesser measures. If a trial court believes it can, it should do so, as we trust the trial court will here on remand.

### C. *Future Benefits to Zonen from the Release of Alpha Dog*

The trial court found Zonen had no *present* financial interest in Alpha Dog; while he was a consultant, he was not compensated in any way for his assistance. Hollywood contends, however, that by contributing to Alpha Dog, Zonen intended to create the prospect of tangible or intangible future benefits;

---

[7] In truth, that either side is inordinately responsible here is not entirely clear. Jack Hollywood, Jesse James Hollywood's father, was also a paid consultant in the making of Alpha Dog.

he elevated the profile of a case he purportedly considers his "legacy," put himself in a position to garner additional laurels and plaudits, and, perhaps, expanded the market for a book of his own based on this case. Thus, according to Hollywood, "[f]uture profit may be implied."

As discussed, however, the trial court concluded Zonen's sole interest in cooperating with the Alpha Dog filmmakers was to enhance the likelihood of the fugitive Hollywood's capture. While Hollywood disputes that conclusion, it is supported by substantial evidence. (See *ante*, at pp. 732–733.) Additionally, Mehas testified that Zonen had decided to shelve, for now, any plans for a book because of his belief that it might pose a conflict of interest problem. Hollywood acknowledges as much on appeal.

Consequently, as the trial court found, Zonen is left with the same interest in burnishing his legacy that every attorney has in a high-profile case—indeed, that every attorney on both sides in this case has. Success in high-profile cases brings acclaim; it is endemic to such matters. Moreover, if the high-profile nature of a case presents incentives to handle the matter in any way contrary to the evenhanded dispensation of justice, the problem is not one recusal can solve, as the same issue would arise equally for any theoretical replacement prosecutor. In such matters, we must rely on our prosecutors to carry out their fiduciary obligation to exercise their discretionary duties fairly and justly—to afford every defendant, whether suspected of crimes high or petty, equal treatment under the law. (See *People v. Hill* (1998) 17 Cal.4th 800, 847 [72 Cal.Rptr.2d 656, 952 P.2d 673] ["Our public prosecutors are charged with an important and solemn duty to ensure that justice and fairness remain the touchstone of our criminal justice system. In the vast majority of cases, these men and women perform their difficult jobs with professionalism, adhering to the highest ethical standards of their calling."]; Corrigan, *On Prosecutorial Ethics* (1986) 13 Hastings Const. L.Q. 537, 537 ["The first, best, and most effective shield against injustice for an individual accused, or society in general, must be found not in the persons of defense counsel, trial judge, or appellate jurist, but in the integrity of the prosecutor."].) The trial court recognized as much and denied recusal on this basis.

### D. *The Totality of the Circumstances*

In the end, we view Hollywood's arguments for recusal as resting primarily on the totality of the circumstances. The Court of Appeal shared this view; it ultimately agreed that this case was sui generis, that Zonen's conduct when viewed in its entirety was wholly inappropriate, that he had created

serious problems for the prosecution of the case, and that the only sufficient remedy was to order his recusal.[8]

■ The Court of Appeal assumed Zonen's actions were the product solely of zeal, but expressed the view that Zonen had gone too far in his efforts to apprehend Hollywood. Perhaps so. But section 1424 does not exist as a free-form vehicle through which to express judicial condemnation of distasteful, or even improper, prosecutorial actions. As we have previously held, and as we reiterate today in the companion case *Haraguchi v. Superior Court*, section 1424 offers no relief for actions simply because they appear, or are, improper. (*Haraguchi v. Superior Court, supra*, 43 Cal.4th at p. 719; *People v. Eubanks, supra*, 14 Cal.4th at pp. 591–592.) The Legislature has closely defined the limits of judicial authority to recuse prosecutors, and we must observe them.[9] We do so here. A defendant must identify, and a court must find, some *conflict of interest* that renders it unlikely the defendant will receive a fair trial. The trial court found no such conflict, and the Court of Appeal identified no specific conflict either, instead offering its "considered judgment" that "justice would not be served" if Zonen were permitted to remain. Section 1424 requires more.

This is not to say that Zonen can or should escape censure. We find his acknowledged actions in turning over his case files without so much as an attempt to screen them for confidential information highly inappropriate and disturbing. The trial court made no findings as to whether this omission in fact resulted in the illegal or unethical disclosure of confidential documents, and we certainly are not situated to do so here. If it did result in such a disclosure, sanctions are available, as are authorities whose function it is to pursue those sanctions. We hold only that on the record here, it was not an abuse of discretion for the trial court to conclude Zonen did not labor under any conflict and, accordingly, his recusal under section 1424 was not appropriate.[10]

---

[8] As an aside, we note legitimate reasons exist to question whether recusal would solve the problems the Court of Appeal perceived. For example, the Court of Appeal was concerned that Zonen's disclosure of his case file might have waived prosecutorial work product privileges that would otherwise attach. (See Code Civ. Proc., § 2018.030; *People v. Collie* (1981) 30 Cal.3d 43, 59 [177 Cal.Rptr. 458, 634 P.2d 534].) If so, however, the bell has been rung; recusal does not solve this problem, which persists whether Zonen is recused or not.

[9] Hollywood does not press, and we therefore need not address, any claim that recusal is required here to preserve his constitutional due process rights. (Cf. *People v. Vasquez, supra*, 39 Cal.4th at pp. 58–66.)

[10] Because the record supports the trial court's conclusion there was no cognizable conflict, we need not address its further conclusion that any theoretical conflict was not so grave as to render a fair proceeding unlikely. Moreover, because the trial court permissibly could find there was no conflict, we need not address in any detail Hollywood's contention that the entire Santa

## Disposition

For the foregoing reasons, we reverse the Court of Appeal's judgment and remand this case for further proceedings consistent with this opinion.

George, C. J., Kennard, J., Baxter, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

Barbara County District Attorney's Office should have been recused. In the absence of a conflict, it was not error to deny recusal of either Zonen or the entire office.