Filed 2/5/16  P. v. Andrews CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>STEVEN SHANE ANDREWS,<br><br>    Defendant and Appellant. | B258671<br><br>(Los Angeles County<br>Super. Ct. No. KA095723) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mike Camacho, Judge.  Affirmed.

Verna Wefald, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews and David E. Madeo, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendant and appellant Steven Andrews, a middle school teacher, of more than a dozen sex offenses involving a 14-year-old female student. The trial court sentenced Andrews to an aggregate term of 15 years and 8 months in state prison. We reject Andrews's claims that the trial court erred in (1) denying his motion to recuse the entire Los Angeles District Attorney's Office; (2) deciding not to discharge a seated juror for bias; and (3) giving a flight instruction. The judgment is affirmed.

## FACTS

### Background

Andrews taught history and served as the director of the Associated Student Body (ASB) programs at Lorbeer Middle School in Pomona. He turned 40 years old early in the 2010-2011 school year. The victim, Antonia Doe, turned 14 years old in April 2011 and was nearing the end of eighth grade. She had taken history with Andrews in seventh grade, and, during the second semester of seventh grade and in eighth grade, also participated in his ASB class. Throughout the same time frame, Antonia felt emotionally confused and insecure because her parents were having marital problems, and she and her mother had moved out of the family home. Antonia trusted Andrews, and started discussing her personal life with him. Eventually, the relationship moved onto kissing and touching. About May 2011, Andrews and Antonia started a sexual relationship that continued over the next several months and which is described in more detail below.

### Counts 12 through 17 (Sexual Penetration by Foreign Object and Lewd Acts upon a Child Occurring During May 2011)[1]

A few weeks after her birthday in April 2011, Andrews asked Antonia if their relationship could "go further," and she said yes. Initially, Andrews kissed Antonia briefly, but then the physical touching progressed, with Antonia allowing Andrews to

---

[1]     We identify the counts as numbered in the information and the abstract of judgment, serially beginning with count 2. The counts were numbered slightly differently on the verdict forms submitted to the jury (serially beginning with count 1, rather than, as noted, beginning with count 2). The numbering of the counts on the jury verdict forms appears to have been for sake of clarity for the jury at trial.

touch her breasts over her clothing. They started having physical contact a few times a week in his classroom and the gym. Then, sometime around mid-May, Andrews and Antonia met behind a curtain in the gym during the lunch break. The gym was locked at lunchtime, but Andrews had the key. On this occasion, Andrews kissed Antonia more intensely, and put his hands up her shirt and down the front of her pants.

On another occasion around mid-May, when they were in his classroom during lunch, Andrews asked Antonia if she wanted to touch his erection. He unbuckled his pants and led her hand down to his penis. Antonia pulled down her shorts and underwear, and he rubbed his penis over her vagina.[2]

After the occasion in his classroom noted immediately above, Andrews and Antonia started a continuing relationship involving sexual conduct. They would meet in the gym, either at lunchtime or after school. During this time, Andrews put his fingers inside Antonia's vagina on several occasions.

As the sexual relationship developed, Antonia thought she loved Andrews and thought of him as her boyfriend. He told her that he was going to divorce his wife and marry her after she finished high school. Andrews wrote Antonia a letter for her eighth-grade graduation. He wrote that he loved her and wanted to be with her. He also gave her a shirt, a sweatshirt, and a necklace.[3]

### Count 11 (Unlawful Sexual Intercourse with a Minor Under the Age of 16 Years)

During the course of the events summarized above, Andrews and Antonia began talking about having sexual intercourse. Andrews told Antonia that he did not want her to lose her virginity in his classroom.

---

[2]     At trial, Antonia described Andrews's penis. She testified that he was not circumcised and that his penis had a noticeable "coloration," that it was "like white and red." When Andrews testified in his own defense, he acknowledged that he suffered from dermatitis on his face and genitals.

[3]     Antonia kept the gifts. After the Los Angeles County Sheriff's Department started an investigation, Antonia gave the gifts she had received from Andrews to deputies.

On May 26, 2011, Andrews and Antonia made arrangements to go to his house to have sex. The plan was for her to be dropped at school by her mother, but not to go to her classes, and he would meet her and drive her to his house in his truck. The plan fell apart when Andrews got delayed with work. Andrews told Antonia to go to her early classes, then leave and go to his truck in the school parking lot. At around 11:00 a.m., Antonia went to Andrews's truck and hid in the backseat so she would not be seen. Andrews showed up about five minutes later, and drove Antonia to his house, where they had sexual intercourse.[4] Andrews told Antonia that he loved her.

As Andrews was driving Antonia back to school, Lorbeer's principal, Krystana Walks-Harper, called Andrews's phone and asked if he knew where Antonia was. Andrews said that he did not know and that he had not seen her recently. About 10 minutes later, Andrews called Walks-Harper and said that he had located Antonia and had convinced her to go back to school.

Andrews dropped Antonia off at a park near the school, and he drove to the school and met up with Walks-Harper. Meanwhile, Antonia walked back to the school where she met up with Walks-Harper and Andrews who were waiting at a corner of the school grounds. They all went to the principal's office. Andrews asked to remain with Antonia while Walks-Harper spoke to her about her absence. Antonia said she left school because she was getting bullied by other girls and that her parents' divorce was affecting her. After Andrews stepped out, Antonia told Walks-Harper that everything was fine. Walks-Harper excused Antonia to go back to her classes.[5]

---

**4** On this occasion and others, Andrews ejaculated inside Antonia; he told her that she did not need to worry about getting pregnant because he had a vasectomy. During his trial testimony, Andrews testified that he had, in fact, had a vasectomy; the testimony was given when he explained that it had caused a problem with his testicle which caused him pain during sex.

**5** Andrews later told Antonia that Walks-Harper had subsequently asked him if he and Antonia were doing anything, and that he had said no.

4

Following the sexual intercourse offense on May 26, 2011, Antonia and Andrews had phone sex about once a week. Further, she began to write down in a journal the times that they had sex because it was "special to [her]" and she "just wanted to remember the days that [they] did it."

### Counts 8, 9 and 10 (Oral Copulation, Sexual Penetration by Foreign Object and Unlawful Sexual Intercourse with a Minor Under the Age of 16 Years)

On June 20, 2011, Antonia's class had a graduation field trip to Disneyland. Antonia and Andrews made plans to go to a hotel room on the day of the field trip. Before Antonia got on the bus, Andrews gave her a cell phone so that they could communicate without anyone knowing. After spending time with her classmates, Antonia had free time without a chaperone. Andrews texted Antonia that he would meet her in an hour. He picked her up outside the Disneyland gate, and took her to the Alpine Inn near the park where they had sexual intercourse.[6] Andrews put his tongue and his finger inside her vagina. Afterward, Andrews took Antonia back to Disneyland and she rejoined her classmates.

### Counts 6 and 7 (Unlawful Sexual Intercourse and Sexual Penetration by Foreign Object with a Minor Under the Age of 16 Years)

On July 26, 2011, around noon, Andrews called Antonia and asked her to meet him at Decker Park. She walked to the park and met Andrews at his parked truck. They had sexual intercourse in his truck and he put his finger inside her vagina.

### Counts 4 and 5 (Unlawful Sexual Intercourse and Oral Copulation with a Minor Under the Age of 16 Years)

On August 5, 2011, Andrews and Antonia arranged another meeting. She told her parents she was going to a friend's house, and Andrews picked her up near her house. They drove to a Best Western hotel in Diamond Bar where they had sexual intercourse

---

**6** Andrews made a reservation for a room at the Alpine Inn in person on June 6, 2011, two weeks before the Disneyland field trip. He pre-paid for a room with a cash deposit. He checked into the hotel at about 1:30 p.m. on June 20, 2011.

and she put her mouth on his penis.**7**  Afterward, Andrews drove Antonia back to her street near her house.

### Count 3 (Unlawful Sexual Intercourse with a Minor Under the Age of 16 Years)

On August 17, 2011, Andrews drove to location near Antonia's house at about 5:30 a.m., picked her up and drove to Decker Park where they parked.  They talked for a few minutes, and then Andrews said that he was "horny."  They had sexual intercourse in his truck.

### Count 2 (Unlawful Sexual Intercourse with a Minor Under the Age of 16 Years)

In September 2011, Antonia started ninth grade year at Diamond Ranch High School, but remained in contact with Andrews.  On September 10, 2011, Antonia called Andrews and told him that she would be alone at her house for a couple of hours.  At about noon, Andrews parked across the street, and Antonia let him in.  They had sex in her bedroom.

After having sex, they talked about whether they were going to continue their relationship with Antonia being at another school.  Andrews told Antonia that he was not going anywhere.  Antonia told Andrews that it would probably be a good idea "just to take a break" because she was going to high school and would be busy with school activities, and needed to move on.  She said their relationship was difficult because she had to hide it.  He got mad and asked her why she did not text him during the day anymore.  She began to feel ashamed and disgusted about the relationship.

### Count 19 (Possession of Material Depicting Minors in Sexual Conduct)

After Andrews was arrested, police officials recovered his laptop computer.  Los Angeles County Sheriff's Department Detective Thomas Fortier examined the contents of

---

**7**     Andrews pre-paid for the room with cash the day before.  The front desk supervisor, Mayur Jatwani, who lived at the hotel, checked in Andrews alone, on August 5, 2011.  Later, at around 3:00 p.m., Jatwani passed Andrews's room and saw him and a young "Asian" girl come out of his hotel room.  As soon as they saw Jatwani, they immediately turned around and left quickly in the opposite direction.  Antonia ancestry is Filipino and Mexican.

the computer. It did not contain any photographs of Antonia, but did contain six "thumbnail" photographs depicting female minors engaged in sexual activity.

***The Investigation and Other Evidence***

In early June 2011, one of Andrews's fellow teachers at Lorbeer, Darryl Hutchinson, went to Andrews's classroom to look for him. Hutchinson worked with Andrews on the school's ASB program. When Hutchinson got to Andrews's classroom, the door was locked. He opened it with his key and found Andrews and Antonia inside, sitting together at a table. Hutchinson became concerned and told Andrews he should not be in a locked room with a student. Hutchinson reported this incident to principal Walks-Harper.

On the last day of the school year for teachers in June 2011, Andrews told Hutchinson that he (Andrews) was cheating on his wife. During the same general time frame, Andrews talked to Hutchinson about wanting to transfer to Diamond Ranch High School.

Sometime around September 2011, Andrews's wife told Hutchinson that she was concerned about text messages that she had seen on Andrews's phone. Hutchinson told principal Walks-Harper that he was concerned that Andrews was texting Antonia. Hutchinson also asked his wife, who worked as a vice principal at another school, to speak to the student resource officer at her school, San Bernardino County Sheriff Department Deputy Mary Jean Higgins, about the situation. Because Lorbeer is in Los Angeles County, Deputy Higgins relayed information about the concerns with Andrews to the Los Angeles County Sheriff's Department (LASD).

On September 28, 2011, LASD Deputy "Thorn" talked to Antonia in the office at Diamond Ranch High School. Deputy Thorn asked Antonia if rumors that she and Andrews were having a relationship were true. Because she was scared and wanted to protect Andrews, Antonia said they were not true. After talking with the deputy, Antonia left the principal's office, went to a bathroom, and called Andrews. She said that someone knew about their relationship and asked if he had told anyone. She said that a

deputy was going to his school. Andrews had been at the Lorbeer school early in the day; by the time Deputy Thorn arrived, he was not there.

Antonia went back to class, but after thinking that this was her opportunity to tell the truth, she went back to the office and asked a school official to call the deputy back. Deputy Thorn returned and asked Antonia if she was ready to tell the truth, and she said yes.

Later during the day on September 28, 2011, Andrews called Hutchinson at the Lorbeer school and asked if the police were looking for him. Then, at around 6:30 p.m., Andrews called Hutchinson again and asked him to retrieve his laptop computer from his classroom so that it would not be stolen. Hutchinson called Deputy Thorn, who asked Hutchinson to hold Andrews's computer for the deputies.

On the evening of September 28, 2011, LASD Special Victims Bureau Detective Janet O'Bryan interviewed Antonia at her home. Detective O'Bryan asked Antonia to text and call Andrews to see if he would admit that they had sex. Starting at about 11:38 p.m., Antonia and Andrews had a text conversation that included the exchanges summarized here:

"Antonia: U awake?

Andrews: Somewhat.

Antonia: Baby can't sleep.

Andrews: What's going on exactly.

Antonia: The cops came to school, didn't tell them anything, haven't heard from them since, are u ok?

Andrews: Ya, ive got to go into the district tomorrow and have a talking to as well, what's home like.

Antonia: Dad asking questions, but nothing serious. . . .

Andrews: Ok I should find out tomorrow then who came after me with this. . . .

8

Antonia: Ok was it her, the O[?**8**] . . .

Andrews: No. It wasn't the O. . . . Not sure where this came from but somebody somewhere said something to someone and [they] had to check it out.

Antonia: Hmm, like im still wondering who would've even tipped someone? Have you like told your attorney that weve made love?

Andrews: I talk with u that's all. . . . [¶] . . . Just explain how nothings happened and its all rumors.

Antonia: Oh well I don't think its a good idea to meet up friday anymore but we can talk on the phone?

Andrews: Yes, but need some of the dust to settle here. Find out tomorrow wtf was said about me and from whom. . . . [¶] . . . im gonna be extremely cautious tomorrow. U b too.

Antonia: Babe . . . listen okay? i love you, i miss you. im sorry things are the way they are right now. i don't think this is anything serious itll blow over like before . . . forever and a day?<?

[¶] . . . [¶]

Andrews: . . . Just this is serious with the district and the cops right now. I have to let them know nothing happened. I think the fact that u still have ur phone and i wasn't arrested is good. Just more rumors.

Antonia: haha yes you being arrested is no bueno. . . ugh baby im tired :( can we talk real quick before I go to bed?

Andrews: Ya call me."**9**

---

**8**     During their relationship, Andrews used the term "the O" to describe his wife to Antonia.

**9**     The text messages summarized here were not presented at trial in a time-sequence order.

Antonia then called Andrews. Their phone conversation was recorded and played for the jury at trial, and a transcript was provided to the jurors. The phone conversation included the exchanges summarized here:

"[Antonia]: Are you going to work tomorrow?

[Andrews]: No. I've been asked not to go to work now, through the District.

[Antonia]: Oh.

[Andrews]: And I've been asking – asking some questions and I want to find out what's going on. Somebody said something that was – they had to follow up on. That's why they came and talked to you.

[Antonia]: Oh, do you think someone like followed us to the motel?

[Andrews]: Uhn-uhn.

 [¶] . . . [¶]

[Antonia]: Okay. And none of the teachers, like Hutchinson hasn't been asking anything?

[Andrews]: No. No.

[Antonia]: See, that's funny, because like why – why now? Like this is really random.

[Andrews]: Yeah, I know. But, you know, when you're a school and you go and, who knows?

[¶] . . . [¶]

[Antonia]: Yeah. What do you think they'll charge you with if something happens?

[Andrews]: I don't know. I don't know honestly. It's changed. Uhm, today was just like the shock of it all and stuff, and like this is what's going on this week. You know, if --- if ---

[Antonia]: Well, it'll be fine, though.

Andrews: Yeah, I mean, it's just like you, you know, like how you told the cops and stuff nothing happened.

 [¶] . . . [¶]

10

[Andrews]: . . . I have to be at the District at 8 a.m. I have to talk to the head of Personnel. . . . [L]ike --- you know, somebody said something – something to somebody. And maybe somebody's mom overheard it and, you know, called the District. That heard this about a teacher and –

[Antonia]: Yeah.

[¶] . . . [¶]

[Andrews]: Remember what we said about the patience.

[Antonia]: Mmnh-mmnh

[¶] . . . [¶]

[Antonia]: This too shall pass.

[Andrews]: All things do. Just give me tomorrow and stuff like --- and I'll let you know what – exactly what happened and stuff. Okay?

[Antonia]: Okay.

[Andrews]: And, uh, if anybody asks, keep your mouth shut, you know.

 [¶] . . . [¶]

[Antonia]: . . . Are we ever going to meet up again?

[Andrews]: After – after this thing is over and stuff, we'll --- we'll see okay?

 [¶] . . . [¶]

[Antonia]: . . . I still need you . . .

[Andrews]: I know.

[¶] . . . [¶]

[Antonia]: Will we ever be together again, though?

[Andrews]: And hang out and everything? Of course.

[Antonia]: No, will we ever make love again?

[Andrews]: Ah, you know, I'm asking for one day.

 [¶] . . . [¶]

[Antonia]: I think, now, that just all the times that we've made love was just a game to you.

[Andrews]: No.

[Antonia]: Well, I mean, obviously, if you can't even say one thing, then, it's like it doesn't mean anything to you obviously.

[Andrews]: No. Listen to me. Okay. Everything, everything has just come to this head. And just let me explain for a second, please. This is not a --- I'm not playing games with you. Okay. I'm not messing with you. . . .

 [¶] . . . [¶]

[Antonia]: Was the love we made just sex for you?

[Andrews]: I'm sorry. What?

[Antonia]: I said, 'The love that we made, was it just sex for you?

[Andrews]: No.

[¶] . . . [¶]

[Antonia]: And I love you. But, I just, I need some kind of reassurance that it wasn't just sex to you.

 [¶] . . . [¶]

[Andrews]: It's not just sex for me.

[Antonia]: I need you inside of me, again, baby.

[Andrews]: I really can't think about that stuff right now.

 [¶] . . . [¶]

[Antonia]: Will you still make love to me?

[Andrews]: Say it again.

[Antonia]: I said, 'Will you still make love to me'?

[Andrews]: I will."


Andrews and Antonia then had phone sex. During their exchanges, Antonia asked, "You miss my pussy, baby, don't you?" and Andrews answered, "Yeah. Oh, I need to touch you." When Antonia asked, "You want to make love like before?" Andrews answered that he wanted "something new. . . . I want you to go down on me, baby." They continued having phone sex as Andrews masturbated. As the phone sex ended, Antonia told Andrews, "I really like the way you came on my stomach. . . .

You're gonna do it again?" and Andrews said, "Yeah." After the phone sex, Antonia asked Andrews, "Was it hotter than last Saturday, baby?" and Andrews responded, "Oh yeah."

As noted above, Antonia kept a written journal of her "special moments" with Andrews. She recorded five of the six sexual intercourse offenses with Andrews; the final incident on September 10, 2011 was not recorded because it occurred during one of the times she was moving in and out of the family home and the journal was boxed away. When Detective O'Bryan interviewed Antonia, she gave the writing to the detective. Antonia also handed over the phone that Andrews had given her.

Detective Thomas Fortier examined Andrews's computer. There were no photographs of Antonia, but there were six thumbnail photographs depicting female minors engaged in sexual activity. The computer operating system was installed in February 2011, so the photographs had to have been installed between that date and the date when the computer was taken during the police search.

***The Criminal Proceedings***

In February 2012, the People filed an information charging Andrews with the following crimes, listed respectively: unlawful sexual intercourse with a minor under the age of 16 years (count 2; Pen. Code, § 261.5, subd. (d));[10] unlawful sexual intercourse with a minor under the age of 16 years (count 3; § 261.5, subd. (d)); unlawful sexual intercourse with a minor under the age of 16 years (count 4; § 261.5, subd. (d)); oral copulation of a minor under the age of 16 years (count 5; § 288a, subd. (b)(2); unlawful sexual intercourse with a minor under the age of 16 years (count 6; § 261.5, subd. (d)); sexual penetration by foreign object of a minor under the age of 16 years (count 7; § 289, subd. (i)); oral copulation of a minor under the age of 16 years (count 8; § 288a, subd. (b)(2)); sexual penetration by foreign object of a minor under the age of 16 years (count 9; § 289, subd. (i)); unlawful sexual intercourse with a minor under the age of 16 years (count 10; § 261.5, subd. (d)); unlawful sexual intercourse with a minor under the age of

---

**10** All further undesignated section references are to the Penal Code. We have renumbered the counts to conform with the jury verdict sheets and abstract of judgment.

16 years (count 11; § 261.5, subd. (d)); sexual penetration by foreign object of a minor under the age of 16 years (count 12; § 289, subd. (i)); lewd act upon a child (count 13; § 288, subd. (c)(1); sexual penetration by foreign object of a minor under the age of 16 years (count 14; § 289, subd. (i)); lewd act upon a child (count 15; § 288, subd. (c)(1)); sexual penetration by foreign object of a minor under the age of 16 years (count 16; § 289, subd. (i)); lewd act upon a child (count 17; § 288, subd. (c)(1)); and possession of matter depicting a minor engaged in sexual conduct (count 19; § 311.11, subd. (a)).[11]

The charges were tried to a jury in February and March 2014, at which time the prosecution presented evidence establishing the facts summarized above. Andrews testified in his own defense. He admitted that he had a "personal" relationship with Antonia, but denied that they ever engaged in any sexual activity. He denied ever "knowingly" having phone sex with Antonia, explaining that he had phone sex with a person using the name Jennifer who used a phone number that he did not recognize. On cross-examination, he admitted that he had phone sex with Antonia during their phone call on September 28, 2011. He gave the following explanation for why had phone sex during the call: "The phone sex that I had on September 28th was in response to the fact that I could not get ahold of law enforcement and that my fear was that Antonia, in her fit of anger, was going to accuse me of actual real sex events, and, so, by engaging in the phone sex, fake, real, whatever you want to believe, was to prove that she could not point out any specific dates, times, or instances that we actually engaged in sex and the fact that, if at any time during that call that she implied that my penis had entered her vagina, she would not be able to explain my dermatitis nor would she understand that I was getting prepped for surgery for an epididymectomy on my left testicle."

---

[11]     Initially, the information further alleged a count 18 for first degree residential burglary (§ 459) on the theory that Andrews had entered Antonia's home on September 10, 2011 with the intent to commit a felony. Count 18 was dismissed before the case was submitted to the jury.

The jury returned verdicts finding Andrews guilty of all of the counts identified above. On August 28, 2014, the trial court sentenced Andrews to a total aggregate term of 15 years and 8 months in state prison as follows: On count 2, unlawful sexual intercourse with a minor under the age of 16 years, the court imposed the upper term of four years. The court added consecutive one-year terms (1/3 the mid-term) on counts 3, 4, 6, 10, and 11, plus consecutive 8-month terms (1/3 the mid-term) on counts 5, 7, 8, 9, 12, 13, 14, 15, 16, and 17. On count 19, the court imposed a concurrent one-year term.

Andrews filed a timely notice of appeal.

## DISCUSSION

### I. Recusal

Andrews contends the judgment must be reversed because the trial court erred in denying his motion to recuse the Los Angeles County District Attorney's Office, in its entirety, from prosecuting the charges against him. We disagree.

Section 1424 establishes the procedures governing disqualification of prosecuting attorneys. Section 1424, subdivision (a)(1), provides that a motion to disqualify a district attorney "may not be granted unless the evidences shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial." (And see also *Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711 (*Haraguchi*); and *Hollywood v. Superior Court* (2008) 43 Cal.4th 721, 727 (*Hollywood*).) The statute contemplates a two-part test. In the first step, the trial court must determine whether the evidence shows there is a conflict of interest, meaning whether the evidence demonstrates there is a " 'reasonable possibility that the [prosecutor's] office may not exercise its discretionary function in an evenhanded manner.' " In the second step, the court must determine whether the conflict is " ' " 'so grave as to render it unlikely that [the] defendant will receive fair treatment during all portions of the criminal proceedings.' " ' " (*Haraguchi, supra*, 43 Cal.4th at pp. 711-713; and see also *Hollywood, supra*, 43 Cal.4th at pp. 727-728.)

15

A motion to recuse is directed to the sound discretion of the trial court, and its decision either to grant or deny the motion is reviewed for abuse or discretion. (*Haraguchi, supra*, 43 Cal.4th at p. 711; *Hollywood, supra*, 43 Cal.4th at p. 728.) On review of a ruling on a motion to recuse, the trial court's findings of historical fact are reviewed under a substantial evidence standard of review, its conclusions of law are reviewed de novo, and its application of the law to the facts as fixed by the court's determination is reversible only where the party challenging the ruling demonstrates that it amounted to an abuse of judicial discretion. (*Haraguchi, supra*, 43 Cal.4th at pp. 711-712.) The recusal of an entire prosecuting agency, as opposed to a particular, individual prosecutor, "'is an extreme step'" which requires a showing that the recusal of the entire prosecutor's office al "is necessary to assure a fair trial. The showing of a conflict necessary to justify so drastic a remedy must be especially persuasive." (*Spaccia v. Superior Court* (2012) 209 Cal.App.4th 93, 106-107.)

***The Motion Setting***

Here, Andrews filed a motion to recuse the Los Angeles County District Attorney's Office some seven months after the People filed the information. Andrews's motion to recuse the District Attorney's Office in toto was based on three principle claims. First, he claimed the District Attorney's Office could not be fair to him because Antonia's father was an investigator employed in the District Attorney's Office. As stated by Andrews's motion: "The District Attorney's Office . . . appears to be pursuing private justice on behalf of a District Attorney's Office employee rather than pursuing public justice through an even-handed and fair application of the laws, consistent with the prosecution of similarly situated defendants." Second, Andrews claimed that the District Attorney's Office had wrongly delegated its *Brady*[12] discovery obligations to the investigating detectives, and that "[t]he only rational explanation for [the] discovery failures [was] private justice." Finally, Andrews stated that the District Attorney's Office's had made an offer to settle his case for a "determinate number of years in

---

[12]     *Brady v. Maryland* (1963) 373 U.S. 83

16

prison"[13] that was "several hundred percent higher than [a] selection of cases reported in the local press, which most closely approximate[d his case]." He argued that the offered, disproportionately harsh punishment demonstrated that the District Attorney's Office had chosen to pursue a "selective and discriminatory" prosecution to satisfy one of the office's own. Andrews supported his claim of disproportionality between his case and other similar cases by offering news articles concerning three cases involving defendants who pled guilty to sex crimes with children.[14]

The Attorney General filed opposition to Andrews's motion to recuse the District Attorney's Office. The opposition argued that Andrews had failed to make a showing that the assigned prosecutor, or the District Attorney's Office, could not exercise its prosecutorial functions in a fair manner. In other words, he did not point to any actual unfair activity. The opposition argued that the prosecuting deputy district attorney had turned over all discovery in possession of the District Attorney's Office, and that, to the extent materials were held by other agencies, there was no objection to "holding a discovery hearing, attended by representatives of the agencies in possession of the document, to resolve the issue." Further, the assigned prosecutor at the time, Deputy District Attorney Deborah Scott, submitted a declaration in which she stated that she never met Antonia or her father, and had no personal or vested interest in the case.[15]

---

[13]  Andrews's motion stated that he would "not cite the exact number . . ." of years offered. At the hearing on the motion to recuse, Andrews's counsel represented that the District Attorney's Office had offered to settle the case for a 10-year prison term.

[14]  We note here that none of the cases discussed in Andrews's motion to recuse involved prosecutions by the Los Angeles County District Attorney's Office. Further, in one of the cases, the defendant had pled guilty to "two felonies for having a sexual relationship with a 14-year-old girl." The number of counts to which the defendant pled in the second case is not stated in the news story about the case. In the third case, the defendant pled guilty to four counts of lewd acts with a child under the age of 14.

[15]  Deputy District Attorney Scott did not try Andrews's case. Deputy District Attorney Lisa Coen acted as trial prosecutor. At no point after the trial court denied Andrews' pre-trial motion to recuse the entire District Attorney's Office did Andrews renew his recusal motion as to Coen.

17

At argument on Andrews's motion, the deputy attorney general noted that the three cases proffered by Andrews to show his plea offer was unreasonably high could not be meaningfully compared to Andrews's case because the strength of the evidence in each of the cases was not known from the news stories. The prosecutor explained that the evidence in Andrews's case was "very compelling," and that Andrews had not been treated any differently than any other defendant. The trial court denied the motion to recuse, explaining that it was "not persuaded that there [was] any impropriety, even the appearance of impropriety on the part of the DA's office . . . . [A]n offer of ten years with the maximum of 17 with an apparent strong case is not at all unreasonable."

*Analysis*

It cannot be said for a number of reasons that the trial court abused its discretion in denying Andrews's motion to recuse. First, Andrews's evidence did not support a conclusion that there was a reasonable possibility the prosecutors might not exercise their duties in an evenhanded manner. Andrews's assertion that no prosecutor in the Los Angeles District Attorney's Office could prosecute him fairly and impartially because the victim's father was employed by the Office as an investigator was largely group-bias speculation which failed to establish a true disabling conflict of interest. Indeed, the assigned prosecutor in this case at the time of Andrews's motion, Deputy District Attorney Deborah Scott, submitted a declaration in which she attested that she had never met the victim or the victim's father, that she had no personal or vested interest in the case, and that no one in the District Attorney's Office had suggested to her that she should prosecute the case differently than she would any other matter. The trial court accepted this representation, and we will not reassess its credibility determination on appeal. Further, we note that Andrews never asserted in the trial court, and has not asserted on appeal, that either Deputy District Attorney Scott or Coen, were actually biased.

18

We also reject Andrews's assertion that the plea deal offered to him was "extraordinarily high compared to the plea deals made to other similarly situated defendants." The showing in Andrews's recusal motion does not support his assertion on appeal. Andrews was charged with 17 counts of sex crimes against an emotionally vulnerable minor over whom he held a position of trust. He faced a maximum prison term of 17 years in state prison. We agree with the trial court that there is nothing extraordinary to see in the District Attorney's Office decision not to settle the case for sentence of less than the 10 years offered. A prosecutor's decision not to make a plea offer that is as low as a defendant believes is appropriate is not evidence establishing that the prosecutor is acting out of a conflict of interest. Indeed, a prosecutor has no legal obligation to make any plea offer at all as there is no constitutional right to a plea bargain. (*People v. Trejo* (2011) 199 Cal.App.4th 646, 655 (*Trejo*), citing *Weatherford v. Bursey* (1977) 429 U.S. 545, 561.) Absent a showing of vindictiveness poisoning the criminal proceedings, plea issues do not establish a conflict justifying recusal of a prosecutor for trial. (*Trejo, supra*, 199 Cal.App.4th at p. 656.) Moreover, the news stories about three cases submitted by Andrews to show what an "ordinary" plea offer should have been did not involve cases that were prosecuted in Los Angeles County, and were not developed with a showing of the relative strength and weaknesses of those cases as compared to Andrews's case. Andrews's argument that the three cases were "indicative of the traditional pattern of settling such cases in the adjacent counties" is an assertion that is not supported by the underlying showing.

Finally, even assuming the trial court erred in denying Andrews's recusal motion, he cannot prevail on appeal on his claim of recusal error in the absence of a showing that he was prejudiced by the court's ruling. (See *People v. Vasquez* (2006) 39 Cal.4th 47, 67-71 (*Vasquez*).) Although alerted to the issue of prejudice by the respondent's brief filed by the People, Andrew's reply brief does not address the issue. In short, he has failed to establish that any error with respect to the District Attorney's Office's presence

19

in his case actually prejudiced his case. For this reason, his claim of recusal error must be rejected.[16]

## II.    The Juror Discharge Claim

Andrews contends the judgment must be reversed because the trial court erred in denying his request to discharge a juror during trial. Andrews argues the record shows that the juror in question was biased in favor of prosecution, and that keeping her on his case resulted in a violation of his due process right to a fair and impartial jury. We disagree.

### *The Trial Setting*

The following exchange took place at the opening of the morning proceedings on the second day of Antonia's testimony, before the jury had entered the courtroom. The prosecutor, Deputy District Attorney Lisa Coen, told the court that it was brought to her attention after she had returned to her office at the end of the previous court day that a juror said something to the victim's father to the effect of "I'm a juror on this case" and "Gee, I don't know who to believe," or "I don't know what to believe." The prosecutor said she did not question the father "because I wanted to just preserve whatever he was going to say if the court inquired."

The prosecutor then added that, although it was "probably trivial . . . in the interest of full disclosure" she wanted to bring to the court's attention that when the jury re-entered the courtroom for the afternoon proceedings on the day before, with the judge holding open one door and the prosecutor holding open the other door, "a lot of the jurors" said "thank you," and one juror, Juror No. 12, said "good job."

---

[16]    To the extent Andrews argues the denial of his recusal motion resulted in a violation of his right to due process, we reject any such claim for reasons similar to those expressed in *Vasquez, supra*, 39 Cal.4th at pages 58-66. Here, even if we assume the existence of some measureable quantum of prosecutorial self-interest in Andrews's criminal case, the conclusion "[t]hat personal influences on a prosecutor are not always regarded as creating so substantial a conflict as to deprive the defendant of fundamental fairness is not surprising." (*Id*. at p. 63.) As we discussed above, Andrews has failed to show any specific prosecutorial actions taken as a result of a conflict that deprived his of a fundamentally fair proceeding.

20

The court then stated it recalled personally opening the doors to invite the jurors in, that Ms. Coen was on the opposite side of the doorway holding open the door, and "certain comments" were made as the jurors "were filtering in."

The victim's father was called into the courtroom and was questioned by the court from counsel table. In pertinent part, the father said a juror "came up to me and just asked me how long court goes for the day, and I said, 'It could go until 4:00 or 4:30 normally.' Then he said, 'This case is kind of weird and I don't know what to believe.'" Then the juror walked away. In response to the court's questioning, the father said he had been seated down the hallway, not anywhere near the courtroom. The father stated his impression that the juror was "just making small talk," and he probably thought the father was "just someone in the hallway, maybe I work here or something." The court then reminded him that he had been seated in the audience in the courtroom. Based on the father's description of what the juror was wearing, Juror No. 9 was identified and was asked to speak to the court, after the father was excused.

The court told Juror No. 9 it had been brought to the court's attention that Juror No. 9 said to someone in the hallway the day before that "the case is kind of weird and you don't know who to believe, something to that effect." The court asked if that occurred, and Juror No. 9 said "That's not correct." Juror No. 9 said he had spoken to a "detective" briefly, said something like "It's strange" or "It's kind of a strange case." He adamantly denied saying anything like he didn't know who or what to believe. When asked if there was a reason why he chose to talk to that person in particular, Juror No. 9 replied no, except he believed the person was a detective because Juror No. 9 had seen him in the courtroom. The court began to say "Now, making a statement even saying 'It's kind of a strange case' to --" when Juror No. 9 interrupted to say, "I don't think I actually said that but it was something minor. . . like 'This is kind of different'" or something like that." Juror No. 9 stated that he had not expressed any similar concern to anyone else, including not to any other juror.

After that, over the course of discussions with counsel both before and after the court questioned Juror No. 12, the court stated five times it did not believe Juror No. 9 was being honest and forthcoming. The court stated it found Juror No. 9 to be "disingenuous," which "troubled [the court] immensely." Further, the court stated that it believed the victim's father's version of what happened and "I did not believe Juror No. 9 at all when he attempted to minimize his conduct." Finally, the court expressed the view, "Had he just been forthcoming and admitted, 'Yeah, I did that and I shouldn't have,' he would still be on this panel."

In addition to mistrusting Juror No. 9, the court stated it found Juror No. 9 had "approached what he thought could be a witness and expressed some opinion about the case." The court later explained, "In the juror's own mind, he was communicating with a detective on the case . . . which means that, on his own volition, he wanted to express an opinion to a witness in the case which I think is completely inexcusable." The court then excused Juror No. 9, and ordered an alternate juror to replace him. The court then dealt with an unrelated matter.

When proceedings resumed, the court took up the matter involving the other juror. The court stated its view that the comment was "just a comment of a good job." But the court deferred to defense counsel and questioned Juror No. 12 outside the presence of other jurors. The court asked her if when she entered the courtroom the previous day she had made a statement to Ms. Coen to the effect of "good job" and Juror No. 12 replied, "Yes, I did." The court asked her what she meant by that. Juror No. 12 said, "Doing good, you know." The court asked "Doing good in the courtroom?" and she replied "Yeah. Because of the kids and school." The court asked if she had expressed her view of Ms. Coen's performance to any other juror, or anyone else, and Juror No. 12 said "No. That was only when I was entering." The court said, "It was in passing, I understand that," and the juror replied, "Right." The court admonished her not to form or express any opinion about the case, asked if she agreed, and Juror No. 12 said "Yes."

After Juror No. 12 left the courtroom, the court told counsel its view that Juror No. 12 made a comment to Ms. Coen about her impression of Ms. Coen's performance in the courtroom, "nothing else." The court acknowledged, "It is an expression about an opinion about the case, not much different from Juror No. 9," and asked defense counsel "for her impressions. What do you think we should do?" Defense counsel asked the court to excuse Juror No. 12, and the prosecutor said "I'll submit it, your Honor."

The court explained it was reluctant to excuse Juror No. 12 based on a comment about the case made in passing. The court contrasted Juror No. 12 with Juror No. 9, who "on his own volition, sought out a person, a person that he or she thought was a witness in the case, and made a statement about the case. This juror was being invited into the courtroom by court order, quite frankly, and just walked past Ms. Coen and said a comment in passing 'good job,' then continued. Didn't seek her out." The court then made its third comment about Juror No. 9 being "somewhat disingenuous about what he, indeed, said to [the victim's father] to the court and that troubles me immensely and that factored into my decision." The court found Juror No. 12 in contrast "was forthcoming. She said, 'Yes, that's exactly what I meant by it.'" In contrast with Juror No. 9, the court found "Juror No. 12 admitted and acknowledged and I see no harm. It certainly is not going to jeopardize any of the parties of a fair trial."

### The Governing Law

A defendant in a criminal case has a constitutionally guaranteed right to trial by impartial jurors. (U.S. Const., 6th and 14th Amends.; Cal. Const., art. I, § 16; *Irvin v. Dowd* (1961) 366 U.S. 717, 722; *In re Hitchings* (1993) 6 Cal.4th 97, 110.) An impartial juror is a person who is " 'capable and willing to decide the case solely on the evidence. . . .' " (*People v. Nesler* (1997) 16 Cal.4th 561, 581, italics omitted, quoting *Smith v. Phillips* (1982) 455 U.S. 209, 217.)

The constitutional right to trial by impartial jurors is protected in part under section 1089. As relevant, section 1089 provides: "If at any time, whether before or after the final submission of the case to the jury, a juror . . . upon . . . good cause shown to the court is found to be unable to perform his or her duty, . . . the court may order the juror to

be discharged and draw the name of an alternate, who shall then take a place in the jury box, and be subject to the same rules and regulations as though the alternate juror had been selected as one of the original jurors." A juror who refuses to follow the trial court's instructions is "unable to perform his or her duty" within the meaning of section 1089. (*People v. Williams* (2001) 25 Cal.4th 441, 448.) The decision whether or not to discharge a juror for good cause shown is a matter for the discretion of the trial court, and, its decision either way is reviewed for abuse of discretion. (*People v. Cleveland* (2001) 25 Cal.4th 466, 474.) The trial court's discharge decision will be upheld on appeal unless it falls outside the bounds of reason. (*People v. Earp* (1999) 20 Cal.4th 826, 892.)

*Analysis*

We find the trial court did not abuse its discretion in declining to discharge Juror No. 12, while discharging Juror No. 9. The trial court at all times was patient, solicited the views of counsel and responded to their concerns. The court clearly had a strong sense that Juror No. 9 could not be trusted to fulfill his duty as a juror, and an equally strong sense that Juror No. 12 could be trusted. Reading a cold transcript, blind and without the benefit of the myriad nonverbal cues that inform the trial court who observes firsthand, it could be read into the comment of Juror No. 12 that she had an intent to tell the prosecutor she was favorably impressed with the prosecution case. But it would seem odd that Juror No. 12 would do that while entering the courtroom alongside the other jurors, with the judge standing right there holding open one of the doors. More to the point, the trial court clearly explained the reasons he did not believe having Juror No. 12 on the case would deprive the parties of a fair trial, and the court's explanation strikes us as reasonable. We will not reinterpret what happened.

A reviewing court must accept the trial court's credibility determinations and findings on questions of historical fact in the context of a question about a juror's ability to perform his or her duty, and the trial court's credibility determination is binding on the appellate court if supported by substantial evidence. (*People v. Cleveland, supra*, 25 Cal.4th at p. 474.) The trial court heard from both Juror No. 9 and Juror No. 12. Based

24

on the questioning, it found Juror No. 9 should be excused but Juror No. 12 should remain on the jury. The trial court's decision not to discharge Juror No. 12 does not rise to the level of an abuse of discretion because the court satisfied itself, after an appropriate inquiry, that Juror No. 12 could decide the case solely on the evidence.

## III.    The Flight Instruction

Andrews contends the judgment must be reversed because the trial court erred in giving the standard instruction pursuant to CALCRIM No. 372 concerning flight after being accused of committing a crime. He argues the instructional error resulted in a violation of his constitutional right to due process, and cannot be shown to have been harmless under the standard of *Chapman v. California* (1967) 386 U.S. 18. We disagree.

As given at Andrews's trial, CALCRIM No. 372 instructed the jury as follows: "If the defendant fled or tried to flee after he was accused of committing the crime, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled or tried to flee, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled or tried to flee cannot prove guilt by itself." The trial court gave the instruction, over Andrews's objection, based on its determination that there was evidence that Andrews left the school upon learning that a deputy was arriving to interview him about Antonia's accusations.

A trial court properly may give a flight instruction "whenever evidence of the circumstances of defendant's departure from . . . his usual environs . . . logically permits an inference that his movement was motivated by guilty knowledge." (*People v. Turner* (1990) 50 Cal.3d 668, 694.) Under the plain language of the instruction, whether a defendant's conduct constitutes flight, and the weight to be given to such flight, if found, are questions for the jury. (*People v. Silva* (1988) 45 Cal.3d 604, 628.)

Here, the trial court correctly determined there was sufficient evidence to support giving the flight instruction. The evidence showed that a deputy spoke to Antonia at her school on September 28, 2011 about rumors of a sexual relationship between her and Andrews, and that, immediately thereafter, Antonia telephoned Andrews at Lorbeer and told him that the deputy was going to Lorbeer. Before the deputy arrived at Lorbeer,

25

Andrews left the school. After leaving, Andrews called his fellow teacher at Lorbeer, Hutchinson, asking if the police were looking for him. By Andrews's own testimony, he drove home and then drove to his uncle's home in Glendora. This evidence was sufficient to permit a reasonable inference that Andrews's act of leaving Lorbeer, and then leaving his own residence, was for the purpose of avoiding being arrested, thus supporting the flight instruction. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1055.)

Finally, assuming the trial court erred by instructing on flight with CALCRIM no. 372, we would find the error harmless. An instructional error may only result in reversal if it causes a miscarriage of justice. (Cal. Const., art. VI, § 13.) "[A] 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836; see *People v. Turner, supra,* 50 Cal.3d at p. 695 [applying *Watson* standard of prejudice to claim of erroneous reading of CALJIC No. 2.52, the former flight instruction].) The evidence of Andrews's guilt was overwhelming when the evidence corroborating Antonia's testimony is taken into account. Antonia testified that she and Andrews had a sexual relationship from May through September 2011, and that they had sexual intercourse on six separate occasions. Antonia's testimony was corroborated by testimony from Andrews's fellow teacher, Hutchinson, who personally observed a close, unprofessional relationship between Andrews and Antonia, and by evidence that Andrews reserved hotel rooms and stayed in the rooms at the time Antonia testified she had sex with him. At the Best Western hotel, an employee saw Andrews and a young "Asian" female leave Andrews's room. Andrews himself admitted that he stayed at both these hotels on these dates. In addition Antonia kept a contemporaneous journal in which she detailed her sexual encounters with Andrews. Andrews's texts, and his comments during a phone call, on September 28, 2011, as detailed above, included comments tantamount to an admission of a sexual relationship with Antonia. Against this showing, Andrews's testimony was weak and not reasonable. His denial of phone sex was refuted by the recorded phone sex on September

26

28, 2011, and his explanation that he was trying to show false accusation by Antonia did not make sense. We see no probability that the jury's verdicts might have been different had a flight instruction not been given, even if the *Chapman* standard is applied.

## IV.   Cumulative Error

Andrews contends he is entitled to a new trial due to the cumulative effect of the errors we have addressed above. Because we have found no error, and we have found any assumed error to be harmless even under the heighted *Chapman* standard, we find no basis for granting a new trial based on Andrews's cumulative error claim.

## DISPOSITION

The judgment is affirmed.


BIGELOW, P.J.

I concur:



GRIMES, J.

RUBIN, J. – Concurring

       I agree with the majority's analysis in Parts I (recusal of the District Attorney's office) and III (flight instruction). I also agree with the conclusion in Part II (juror misconduct) that there was no error. I do have concerns about the proceedings involving Juror No. 12 only. Before I address those concerns, I step back to put into historical and jurisprudential context the importance of the issue presented by the asserted misconduct of Juror No. 12.

       I start with comments by United States Supreme Court Justice Tom Clark, writing in *Irvin v. Dowd* (1961) 366 U.S. 717, 722-723:

       "England, from whom the Western World has largely taken its concepts of individual liberty and of the dignity and worth of every man, has bequeathed to us safeguards for their preservation, the most priceless of which is that of trial by jury. This right has become as much American as it was once the most English. . . . In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process. . . . In the ultimate analysis, only the jury can strip a man of his liberty or his life. In the language of Lord Coke, a juror must be as 'indifferent as he stands unsworne.' "

       The case before us goes to the heart of this right of ours to a jury, a right described by Justice Clark as "priceless." The constitutional issue presented in Part II of the majority opinion is whether defendant was afforded a jury trial by an unbiased jury. More pointedly, did the remarks that Juror No. 12 made to the prosecutor during a recess evince a form of bias based on her having prejudged the case? As this very court recently stated, "if a juror were to make a statement showing he or she had prejudged the case, that would be a statement of bias, and 'a statement of bias is misconduct because bias is misconduct.' " (*People v. Dokins* (2015) 241 Cal.App.4th 1179, 1199.) In such a case, "if it appears substantially likely that a juror is actually biased, we must set aside the

verdict, no matter how convinced we might be that an unbiased jury would have reached the same verdict." (*In re Carpenter* (1995) 9 Cal.4th 634, 654.)

To recap the relevant proceedings briefly:  On the second day of the victim's testimony,  the District Attorney advised the court about incidents with two jurors, Nos. 9 and 12.  Juror 9 had a brief conversation with the victim's father in a hall outside the courtroom, although the juror told the court that she thought the person was a detective.  After a hearing with counsel at which Juror 9 was present and examined, Juror 9 was excused at the District Attorney's request and over defendant's objection.

The court then turned to the other incident that the District Attorney had reported.  On the previous day, as the jurors were returning to the courtroom following the afternoon recess, the courtroom doors were being held open by the judge and the prosecutor respectively.  Several jurors thanked the prosecutor, but one said, "Good job."  That was Juror 12.  The judge acknowledge that jurors made comments as they "were filtering in" the courtroom.

At a hearing with counsel, outside the presence of the jury and before Juror 12 was questioned, the court stated that the comment was "just a comment of a good job," but at defense counsel's request, the court brought in Juror 12.  The other jurors remained in the hall.  Juror 12 acknowledged she had said "good job" to the prosecutor.  Then the court asked:  "Again, my concern is what did you mean by that?"  Like 'good job' of doing your court or 'good job' opening the door.  It could be something harmless like that I have no idea."

Juror 12 did not pick up on the court's suggestion that it might be a harmless remark about opening the door.  Instead, the following occurred:

"JUROR 12:  No.  Doing good, you know."

"COURT:     Doing good in the courtroom?"

"JUROR 12: Yea.  Because of the kids and school."

"COURT:     Now again, I know that was a harmless comment but technically if you look at it, it's a violation of the court's order not to communicate with any lawyer, party, or witness about the case no matter what the subject matter or comment is. . . ."

The court's initial comments about the remark being harmless occurred before counsel had had the opportunity to argue the point.

The court concluded the hearing shortly afterwards. Defense counsel asked the court to excuse Juror 12. The District Attorney did not argue one way or the other, instead resting on the familiar "submit." Even though the court acknowledged that the comments by Juror 12 were "not much different from [excused] Juror No. 9," the trial court refused to excuse Juror 12. When the trial resumed, the court admonished all the jurors not to "form or express any opinions about the case" or discuss the case with anyone.

The law is well settled that jurors may not discuss the case even among themselves before they begin deliberations. (*People v. Polk* (2010) 190 Cal.App.4th 1183, 1201.) "A violation of that prohibition through discussion with a nonjuror prior to rendering a verdict is viewed as serious juror misconduct." (*Ibid.*) However, the rule prohibiting such communications is primarily designed to preclude the juror from *receiving* information about the case that was not presented at trial. (*Id.* at pp. 1201-1202.) Here Juror 12 did not receive any information but instead made a brief comment *to* the prosecutor.

The real question presented by Juror 12's comment was whether it reflected that the juror had prejudged the case. Was the inference to be drawn from the remark that the prosecution was doing really well and going a long way towards protecting "the kids and school" by making sure this defendant would not be in a position to harm school age children ever again? In determining whether prejudicial misconduct has occurred, we afford great discretion to the trial court's determination. (*People v. Bryant* (2011) 191 Cal.App.4th 1457, 1457.) Certainly the trial court is in a better position than the appellate court to judge a juror's ability to be fair, impartial and to have not prejudged a case. This is especially so when court has questioned the juror in the presence of counsel.

On this record I conclude the trial court did not abuse its discretion in concluding that the juror had not prejudged the case: The comment by Juror 12 was brief, was apparently intended to be a polite remark, and even "the kids and school" explanation

could be reasonably understood as only that it is important to prosecute alleged child molesters, not that Juror 12 had already prejudged defendant Andrews' guilt.

What concerns me the most is that the trial court did not go further in its inquiry by directly asking Juror 12 whether her comment reflected that she had in fact prejudged the case, or was leaning one way or the other. In *People v. McNeal* (1979) 90 Cal.App.3d 830 [*McNeal*], the Court of Appeal reversed a conviction based on juror misconduct. The appellate court focused on the nature of the inquiry conducted by the trial court. "[T]he court's cursory questioning of Juror Exline did not justify its conclusion that she could properly perform her duties as a juror." (*Id.* at p. 839.) *McNeal* involved a juror who had personal knowledge of the facts and had discussed that knowledge with other jurors. Although *McNeal* may have involved more egregious facts, the point of *McNeal* and other cases is that once the record reveals potential misconduct, the trial court has a duty to inquire and to inquire fully. (*See People v. Burgener* (1986) 41 Cal.3d 505, 520-521, disapproved on another point in *People v. Reyes* (1998) 19 Cal.4th 743, 756; *People v. Bryant, supra,* 191 Cal.App.4th 1457; *People v. Castorena,* (1996) 47 Cal.App.4th 1051; *People v. Perez* (1992) 4 Cal.App.4th 893, 905-906.)

The final point on the nature of the inquiry concerns defense counsel's failure to ask the court to conduct a further inquiry. Although counsel asked the court to excuse Juror 12, counsel was apparently satisfied with the record of alleged misconduct because counsel did not ask the court to inquire further or request that counsel be permitted to question the juror. Given the record as developed and considering the reasonableness of the trial court's finding that no prejudicial misconduct had occurred based on that record, I cannot say that the court erred as matter of law in not asking additional questions. Nevertheless, I suggest that further questioning, which might have produced express statements by the juror that she remained fair and impartial and had not prejudged the case, or the opposite, would have been preferable.


RUBIN, J.


4