Filed 11/17/21  In re Z.S. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| In re Z.S., et al., Persons Coming Under the Juvenile Court Law. | B310954 |
| | (Los Angeles County Super. Ct. No. 20CCJP02281A-B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>E.G.,<br><br>Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Stacy Wiese, Judge.  Affirmed.

Johanna R. Shargel, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Jessica S. Mitchell, Deputy County Counsel, for Plaintiff and Respondent.

E.G. (Mother) appeals the juvenile court's jurisdiction findings, removal order, and custody order concerning her daughter Z.S., who was five years old at the time dependency proceedings commenced. The juvenile court credited Z.S.'s reports that Mother physically abused Z.S. and asserted dependency jurisdiction over Z.S. and her younger brother S.S.[1] In addition to sustaining allegations related to Z.S.'s reports of abuse, the juvenile court sustained an allegation that Mother's anxiety and depression (which prompted her to use methamphetamine at one point after dependency proceedings were already underway) placed Z.S. and S.S. at substantial risk of serious physical harm.[2] The juvenile court removed Z.S. from Mother's physical custody, gave sole physical custody of Z.S. to her father, Sa.S. (Father), and granted Mother and Father joint legal custody. We consider whether substantial evidence supports the juvenile court's rulings, focusing primarily on Z.S.'s reports of abuse, which did differ over time in some respects.

---

[1]     The juvenile court's orders pertaining to S.S. are not at issue in this appeal. We are concerned solely with a challenge to the orders made in connection with Z.S.

[2]     As we mention *post*, the juvenile court dismissed an allegation that the children were at substantial risk of serious physical harm from Mother's drug abuse, believing that a positive test for methamphetamine that occurred roughly a year before the jurisdiction hearing was insufficiently probative of a current risk of harm.

3

## I.  BACKGROUND

### A.  *Z.S. Reports Mother Abused Her*

Father and Mother, who were no longer in a relationship, had an existing, agreed-upon schedule for sharing visitation with Z.S.  Z.S. was visiting Father one weekend in March 2020 when she told him Mother had hit her with a broom, kicked her in the stomach, and pushed her into a wall.  Father called the police, and an officer asked Father to bring Z.S. to the police station.

Once there, a law enforcement officer interviewed Z.S.—then six years old—alone.  Z.S. disclosed during the police station interview that Mother hit her with a broom and pushed her into a wall; she also said this abuse occurred between one to three weeks earlier.  The interviewing officer found Z.S.'s answers to his questions about the abuse very vague, and the officer found it significant she responded "I don't know" to numerous questions (many of which were not open-ended).  The officer also presented Z.S. with a broom and asked her to demonstrate how Mother used a broom to hit her; Z.S., however, said she could not.

During the police station interview, the officer inspected Z.S.'s back.  The officer observed light red marks (described as resembling scratches) on her back, and the officer believed one of the marks appeared to be old and healing.  The officer was not of the opinion that the scratches were consistent with being hit with a broom, but he could not determine how Z.S. would have sustained the marks.  One of the marks was under Z.S.'s right arm and the officer thought it could be attributable to being lifted up by that part of her body.

The officer also spoke to Mother and inspected her home.  Mother denied hitting Z.S. or harming her.  Mother told the officer that Z.S. wants attention and lies about whichever parent

4

she is then mad at.  Following the police investigation, Z.S. was left in Father's care for the time being while S.S. would remain with Mother.

### B.     *The Department's Initial Investigation*
#### 1.     *Mother's statements*

A Los Angeles County Department of Children and Family Services (Department) social worker interviewed Mother a few days after Z.S. spoke to the police.  According to Mother, she and Father had been separated for approximately two years and were engaged in an ongoing feud.  Father was emotionally abusive, verbally abusive during a period in which she suffered from postpartum depression, and eventually he became physically abusive.  Mother never reported any domestic violence to law enforcement because she was afraid.

Regarding Z.S.'s allegations of abuse, Mother said she could not believe Z.S. made false allegations against her.  In Mother's view, Z.S. was being manipulated by Father and his mother, M.S. (Paternal Grandmother).  Mother admitted to occasionally spanking Z.S. with an open hand and to at times picking Z.S. up by her arms and her sides to move her away from S.S. when Z.S. would hit him.  Z.S. throws tantrums because she wants to visit Paternal Grandmother.  Mother believes Z.S. is being triggered by Paternal Grandmother asking Z.S. if Mother hurts her, to which Z.S. has replied that Mother hits her.

Mother also told the social worker she suffers from anxiety, feels overwhelmed by S.S.'s needs, and struggles parenting Z.S. Mother admitted using drugs before S.S. was born, specifically methamphetamine, but she denied any current drug usage.

5

Later during the same month of this initial interview (March 2020), however, Mother called a Department social worker two days after submitting to a drug test that had not yet returned results. Mother said she "'made a mistake this weekend'" but initially expressed concern about elaborating because it might impact her children. When the social worker asked Mother if she drug tested two days earlier, Mother confessed she was worried about what the results would be and said, "'You are going to find out anyway so I should just tell you.'" Mother then disclosed she used methamphetamine on a recent Sunday night when a friend came over to help with the kids and Mother "left the home for a few hours to get a break."

The social worker and Mother developed a safety plan and Mother agreed not to again use methamphetamine. Mother's pending drug test came back positive for amphetamines and methamphetamines. Mother's next drug test, taken the following month, was negative (as were subsequent drug tests).

### 2. *Father's statements*

Father told the social worker he lives with his girlfriend, D.L., and D.L.'s child from a prior relationship. D.L., at the time, was also pregnant with Father's child. When Z.S. first revealed abuse by Mother, Father and Mother were operating under an agreed-upon custody schedule (there was no Family Court order in place) where the children lived with Mother in a back house on Paternal Grandmother's property during the week and had overnight weekend visits with Father.

Regarding the abuse allegations, Father stated Z.S. refused to return home to Mother after a visit with Father and said she did not want to go home because Mother was hitting her. Z.S.

6

told Father that Mother hit her with a broom stick, pulled her hair, pushed her, and kicked her in the stomach. Z.S. could not tell Father when this happened, but she reported Mother would hit her almost every day. Z.S. also told Father that Mother threatens her. After Z.S. told him about the abuse, Father called the Pomona Police Department and, at their request, took Z.S. to the police station.

### 3. Z.S.'s statements

Z.S. stated she did not want to return to live with Mother. She said Mother pushed her into a wall, hurting her face, and said she had scratches on her back because of Mother. When asked, Z.S. could not provide additional details about the allegations of abuse, nor could she detail exactly when the abuse occurred or how she got the scratches on her back. Z.S. said her 15-year-old half-sister R.A. (same mother, different fathers) was present in the home when Mother hit Z.S., but R.A. did not see it because she was on her phone. Z.S. maintained she was afraid of Mother.

Z.S. stated she was happy living with Father and wanted to continue to do so. When asked, Z.S. denied knowing what tantrums are, but she admitted to screaming, yelling, and throwing herself on the ground at Mother's home. Z.S. said she cries because she misses Paternal Grandmother and Mother does not let her go to Paternal Grandmother's house.

### 4. Other relatives' statements

P.G. (Maternal Grandfather) stated he visits Mother and the children almost daily. Maternal Grandfather reported Mother is a good Mother who cares for S.S. He acknowledged

7

Mother has spanked Z.S. in the past, but he denied witnessing Mother push, kick, or hit the children with objects at any time.

Z.S.'s half-sister R.A. reported she lives with her father and his girlfriend, but she would prefer to live with Mother. She visits Mother on weekends from Saturday until Sunday. R.A. said she has seen Mother spank Z.S. with an open hand on her buttocks, but R.A. denied Mother ever hit, pushed, kicked, or scratched Z.S. R.A. also reported Z.S. lies about a lot of things, including other people hurting her. She stated Z.S. once told her Father instructed her to say bad things about Mother. R.A. denied seeing Mother physically discipline S.S.

C.      *The Petition and Detention Hearing*

The Department filed a five-count dependency petition in April 2020. Counts a-1, b-1, and j-1 alleged Mother physically abused Z.S. by striking her with a broom resulting in redness and scratches on Z.S.'s body. It further alleged Mother previously struck Z.S. with belts and a broom, pulled her hair, pushed her, kicked her stomach, and pushed her against a wall. According to the petition as filed, Father failed to protect Z.S. because he knew or reasonably should have known about the abuse.

Count b-2 of the dependency petition alleged Mother had a history of substance abuse and was a current abuser of amphetamine and methamphetamine, which rendered her incapable of providing regular care to the children. Count b-3 alleged Mother had mental and emotional problems, including depression and anxiety, that rendered her unable to provide regular care to the children. As filed, these two b-2 and b-3 counts alleged Father knew of Mother's substance abuse and mental and emotional problems, respectively, and failed to

protect the children by allowing Mother to reside in the children's home and have unlimited access to them.

The juvenile court held a detention hearing that same month. The court detained Z.S. from Mother and placed her with Father. The court, however, found there were reasonable services available to prevent the need to detain S.S. and allowed him to remain in Mother's care.

### D.     *Further Interviews*

The Department conducted additional interviews prior to the jurisdiction and disposition hearing.

Z.S. was interviewed again in November 2020.[3] When asked about physical abuse by Mother, Z.S. stated Mother used to hit Z.S. a lot with her hand and Z.S. would have bruises all over. During this interview, Z.S. denied being hit with a broom, but she said Mother and R.A. pulled her hair. She also said Mother would hit S.S. when he was bad. When asked about her monitored visits with Mother, Z.S. stated they have been nice.

Mother was interviewed in December 2020. Mother stated Z.S.'s allegations were false and argued that if she had engaged in the extreme behavior Z.S. alleged, there would have been more signs of abuse. Mother speculated Z.S. made up allegations of abuse because she wanted to be with Father.

Father was interviewed again in February 2021. He denied being aware of Mother's abuse of Z.S. prior to the date on which Z.S. told him about it and he took her to the police. Father said

---

[3]     This court granted Mother's request for judicial notice of a last minute information report and the juvenile court's custody order, which were not included in the Clerk's Transcript.

9

he was suspicious that Mother might have been using drugs, but he did not know she was doing so prior to the dependency proceedings. Father denied knowing Mother was dealing with depression or anxiety. Father reported that, most recently, he and Mother were communicating and co-parenting well. Z.S. was less stressed and anxious, and she was doing well in school.

### E. *The Jurisdiction and Disposition Hearing*

The juvenile court held a jurisdiction and disposition hearing in February 2021. The Department asked to amend the petition to strike all allegations of Father's failure to protect and the juvenile court agreed, making him a nonoffending parent.

The Department and counsel for Z.S. asked the juvenile court to sustain the petition as so amended. Counsel for Z.S. emphasized the red marks seen on Z.S.'s back were corroborative of abuse, particularly when more prominent evidence of injury could have healed in the week or weeks between the abuse and Z.S.'s disclosure of it to Father. Counsel for Z.S. also complained that the police stationhouse interview of her client resorted to leading questions rather than open-ended questions that are appropriate for a child of her age. Z.S.'s attorney argued her client's inability to pinpoint when the abuse occurred was common for a child of her age and Z.S.'s "I don't know" responses "show[] her credibility" by revealing she was not simply "trying to make up a time frame." Counsel for Z.S. added that her client was very happy with her visitation with Mother and even expressed interest in having longer visits, which in counsel's view, again supported Z.S.'s credibility and the lack of any ulterior agenda against Mother. The Department joined the arguments made by minor's counsel.

Mother's attorney asked the juvenile court to dismiss the petition, believing the Department had not carried its burden to establish there was any physical abuse. Mother's attorney conceded Z.S. did not want to return to Mother's home but saw this as evidence not of fear of unmonitored contact with Mother but of a desired to fabricate abuse allegations to stay with a preferred parent. As Mother's attorney put it: "At this time we have a child who has a lot of motive to make false allegations and in fact makes very, very inconsistent statements, some of them ridiculous at times, and it's something to do with her age, and I don't think that Mother is blaming her child. Rather, Mother is very concerned. She has indicated that she felt guilty about what went on, that the child was torn in the middle when the [parents'] separation happened, and she may have had some traumatic results of the parents' separation. [¶] I believe that [Z.S.] is doing well in therapy. Mother would do everything to support her and continue to support her mental health treatment, but at this time I don't believe that in any way, shape, or form the Department has met their burden to show that [Mother] was abusive."

After hearing argument, the juvenile court sustained amended petition counts a-1 (harm or risk of harm from nonaccidental physical abuse by a parent), b-1 (risk of harm from physical abuse), b-3 (risk of harm from mental and emotional problems), and j-1 (risk of harm from physical abuse of a sibling). The court dismissed the b-2 count (risk of harm from substance abuse), apparently of the view that the evidence of then-current use of methamphetamine was insufficient.

Proceeding to disposition, the juvenile court declared Z.S. a dependent of the court under section 300, subdivisions (a), (b),

and (j). The court found it reasonable and necessary to remove Z.S. from Mother and released her to Father. The court found the conditions that justified the initial assumption of jurisdiction no longer existed and were unlikely to exist if it withdrew supervision. It terminated jurisdiction with a custody order granting Mother and Father joint legal, and Father sole physical, custody of Z.S. The court also terminated jurisdiction as to S.S., granting Mother and Father joint legal and physical custody.

The juvenile court explained the differences between its orders regarding Z.S. and S.S., noting Z.S. was "in a different situation" than S.S. Elaborating, the court stated: "The reason the court finds that removal of [Z.S.] from [Mother] is necessary is because, according to [Z.S.]—and the allegation has been sustained—[Mother] physically abused [Z.S.]. She did have marks on her. She did go to the police station, and [Z.S.] is uncomfortable living with [Mother] and is happier with [Father] and is having monitored visits with [Mother] and feels comfortable with that."

## II. DISCUSSION

The core of Mother's argument is that the juvenile court erred by crediting Z.S.'s report of abuse, which Mother denied. Though Mother advances a litany of reasons in support of her position, none are persuasive under the governing deferential standard of review. Z.S. consistently asserted Mother physically abused her, and while she provided different details about the abuse during different interviews, those details were generally consistent—with one exception we shall discuss (concerning use of the broom) that does not convince us to abandon due deference to the juvenile court's findings. The bottom line is we believe the

12

juvenile court was entitled to credit Z.S.'s report of abuse on the record we have before us.  And that resolves the remainder of Mother's arguments on appeal.

### A.  Standard of Review

We review jurisdictional findings "'to see if substantial evidence, contradicted or uncontradicted, supports them. [Citation.]  In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court . . . [and] we review the record in the light most favorable to the court's determinations . . . .' [Citations.]" (*In re R.T.* (2017) 3 Cal.5th 622, 633 (*R.T.*); accord, *In re I.J.* (2013) 56 Cal.4th 766, 773 (*I.J.*).)  Where substantial evidence supports a challenged order, we "affirm the order even if there is other evidence supporting a contrary finding."  (*In re R.V.* (2012) 208 Cal.App.4th 837, 843; see also *Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711, fn. 3 [that lower court findings are based on declarations and other written evidence, as opposed to live testimony, does not lessen the deference due those findings].)

### B.  Substantial Evidence Supports the Juvenile Court's Order

Section 300 of the Welfare and Institutions Code, subdivision (a) authorizes a juvenile court to exercise dependency jurisdiction over a child if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally . . . by the child's parent."  (Welf. & Inst. Code, § 300, subd. (a).)

Substantial evidence supports the juvenile court's finding that Mother nonaccidentally inflicted physical harm upon Z.S.

and there was a substantial risk Z.S. would suffer serious physical harm in the future.  Z.S. initially reported Mother hit her with a broom, kicked her in the stomach, and pushed her into a wall.  During later interviews, Z.S. reiterated Mother pushed her into a wall, hurting her face.  She also stated she had scratches on her back because of Mother, and that Mother hit Z.S. with her hand and caused bruises.  This is sufficient to establish Mother nonaccidentally physically harmed Z.S.  Though Mother denied harming Z.S., the juvenile court was entitled to credit Z.S.'s account of what happened over Mother's.  We are obligated to give due deference to the court's determination.  (*I.J.*, *supra*, 56 Cal.4th at 773 ["""We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court"""].)

Mother argues, though, that no reasonable trier of fact would have found Mother physically abused Z.S., contending primarily that Z.S.'s testimony was internally inconsistent, illogical, contradicted by other witnesses, and deemed insufficient by law enforcement.  Mother may be right that some details of Z.S.'s account are vulnerable to attack, but overall, we believe the core abuse allegations remained within the juvenile court's purview to credit.

First, though Z.S.'s March 2020 and November 2020 statements regarding Mother's abuse identified some different methods of abuse, Z.S. did not change her testimony that Mother had, in fact, physically abused her.  Other than Z.S.'s later denial that Mother hit her with a broom, Z.S.'s statements were not actually inconsistent.  The juvenile court was entitled to credit her reports despite the inconsistency, particularly given her young age (six years old at the time proceedings commenced) and

14

the time that passed between the first statements and the later statement (approximately eight months). In addition, we believe the discrepancy concerning use of the broom could be seen by the juvenile court as likely to arise from a reluctance to accuse a parent of more serious wrongdoing (particularly with Z.S. and Mother's relationship improving during monitored visits that were going well) rather than a recantation of something not true when reported closer to the time of the event in question.

Next, Mother emphasizes Maternal Grandfather and R.A. did not report witnessing any abuse. This, of course, does not mean the juvenile court was required to disregard Z.S.'s consistent assertion that physical abuse occurred. Z.S.'s statements did not describe something impossible or inherently improbable (see *People v. Jones* (2013) 57 Cal.4th 899, 963 ["'[U]nless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction'"]), and the red marks observed on her back were significant corroborative evidence. Moreover, Maternal Grandfather did not live with the family and R.A. only stayed with Mother on weekends; they were obviously not in a position to say what did and did not happen when they were not around.

Mother's argument that there was no evidence Z.S. was abused is belied by her own recognition of the fact that the police observed scratches on her back. Though the police officer who observed the scratches did not believe they were consistent with being hit with a broom, the officer had no explanation for how Z.S. sustained the marks and the severity of the observed marks may have subsided during the week or weeks between the abuse and the reporting of it. The juvenile court also could have appropriately viewed Mother's admitted methamphetamine use

15

as significant in deciding whom to believe; the court could reasonably conclude that Mother was not a reliable historian about her interactions with Z.S. if Mother were under the influence of drugs—particularly when she also admitted she was anxious and depressed largely as a result caring for the children.

Mother's contention that Z.S. was motivated by jealousy and encouraged to fabricate the report by Father and Paternal Grandmother is similarly unpersuasive. There is no direct evidence Z.S. fabricated her allegations. Mother's conjecture that she did so does not require reversal.

Finally, the juvenile court's disparate rulings as to Z.S. and S.S. do not demonstrate Z.S. would be safe in Mother's custody. Z.S. consistently said Mother had abused her. Her initial statements reported Mother had not abused S.S. All other reports similarly stated Mother takes good care of S.S. and attends to his needs. Z.S.'s lone November 2020 statement that Mother hit S.S. when he was bad went against the weight of the evidence regarding Mother's behavior as to S.S. The weight of the evidence supported the juvenile court's conclusion that Z.S. and S.S. were differently situated, and that S.S. could safely remain with Mother while Z.S. could not.

### C. Mother's Remaining Arguments

Because substantial evidence supports the juvenile court's jurisdiction finding based on Mother's abuse of Z.S., we need not consider Mother's challenge to the juvenile court's finding regarding her mental and emotional issues under Welfare and Institutions Code section 300, subdivision (b). (*I.J.*, *supra*, 56 Cal.4th at 773 ["'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the

16

dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence.  In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence'"].)

Nor need we consider Mother's request for reversal of the disposition and custody orders.  The sole basis for Mother's argument is that reversal is warranted because there was no basis for dependency jurisdiction.  We have held otherwise.

## DISPOSITION

The juvenile court's orders are affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, J.

We concur:

RUBIN, P. J.

MOOR, J.